AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)   Case No.   **24mr171**
10115 Range Rd SW )
Albuquerque, NM 87121 )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846; | Distribution and PWID Controlled Substances and Conspiracy Thereto; |
| 18 U.S.C. §§ 922(g)(1) and | Possession of a Firearm by a Convicted Felon; and Possession of a Firearm in |
| 924(c) | Furtherance of a Drug Trafficking Crime |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jordan Spaeth, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_ subscribed electronically and sworn telephonically _ *(specify reliable electronic means)*.

Date: ___ 01/29/2024 ___

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

John F. Robbenhaar, United States Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

### INTRODUCTION

1.      I, Jordan Spaeth, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search residence of JOSE GONZALEZ, aka: "COCHINO", located 10115 Range Rd SW, Albuquerque, NM 87121 ("Subject Premises"). A more detailed description and photographs of the Subject Premises are contained within Attachment A, which has been attached hereto and incorporated herein by reference.

2.      I am requesting a warrant to search the Subject Premises for the items listed in Attachment B, which has been attached hereto and incorporated herein by reference.

### SYNOPSIS

3.      Within the last week, the FBI's Violent Gang Task Force (VGTF) has learned that JOSE GONZALEZ, aka: "COCHINO," (hereinafter "GONZALEZ") was armed, trafficking fentanyl and methamphetamine from the Subject Premises.

4.      Based on the facts and information contained herein, I believe that the Subject Premises contains evidence, fruits, and instrumentalities of violations of:

   a.   21 U.S.C. §§ 841(a)(1) and 846 Distribution and Possession with Intent to Distribute Controlled Substances and Conspiracy thereto;

   b.   18 U.S.C. § 922(g)(1) Possession of a Firearm and Ammunition by a Convicted Felon; and

   c.   18 U.S.C. § 924(c) Possession of a Firearm in Furtherance of a Drug Trafficking Crime (hereinafter collectively referred to as the "Target Offenses").

5.      This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in this matter; however, the affidavit sets forth only the facts that support probable cause to search

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

the Subject Premises as relevant background information. All figures, times, and calculations set forth herein are approximate.

### BASIS OF INFORMATION

6.      During my investigation, I have developed information I believe to be reliable from the following sources: Information from other law enforcement or corrections officials (also referred to herein as "agents"), including oral and written reports; results of physical surveillance; information provided by informants; and records from the FBI National Crime Information Center (NCIC), New Mexico Courts, and the New Mexico Motor Vehicle Division (MVD).

### TRAINING AND EXPERIENCE

7.      I am a special agent with the FBI and am a law enforcement officer of the United States, within the meaning of Rule 41 of the Federal Rule of Criminal Procedure. I have been a sworn law enforcement officer for more than 15 years, serving as a police officer and FBI special agent. I have been an FBI special agent since 2018 and am currently assigned to the FBI's field office in Albuquerque, New Mexico, to the VGTF. As a member of the VGTF, my primary responsibility is to investigate criminal enterprises involving violent gang members and their associates who participate in murders, violations of the Controlled Substances Act, firearms violations, racketeering, and other violations of federal law.

8.      Before being assigned to the VGTF, I was assigned to the Violent Crime Task Force (VCTF) and also investigated felony crimes in Indian Country. During my time on the VCTF I investigated violent repeat offenders, the "worst of the worst" in the Albuquerque area, who participated in crimes such as commercial store robberies, carjackings, bank robberies, interstate threats, violations of federal firearm laws and the Controlled Substances Act. I also investigated violent felonies which were committed on the various Indian Reservations and Pueblos surrounding Albuquerque, which

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

included crimes such as murder, aggravated assault with a deadly weapon, rape, and use of a firearm while in the commission of a violent crime.

9.      My investigative training and experience includes, but is not limited to, reviewing and analyzing phone records, interviewing subjects, targets, and witnesses, writing affidavits for, and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public and financial records. I have conducted hundreds of hours of surveillance on subjects, gang members, and associates suspected of, charged with, and/or convicted of violations of federal law to include violations of the Target Offenses. Over the course of my career, I have arrested several hundreds of persons for offenses including, but not limited to, murder, armed robbery, firearm violations, bank robbery, illegal narcotics possession and distribution, racketeering, and aggravated assault. I have also been responsible for serving subpoenas and supervising cooperating sources and undercover agents.

10.      For the past three and a half years, I have been the government's lead case agent in the investigation of the Brew Town Locos (BTL) Gang. Over the course of that investigation, several dozen BTL members and associates have been arrested, with more than 30 of those individuals being charged federally, for crimes similar to the Target Offenses. I have interviewed several dozen BTL Gang members, including leadership and associates; executed dozens of search warrants on members, associates, sources of supply, residences, and property for evidence of racketeering, murder, violations of the Controlled Substances Act, and federal firearms violations; seized hundreds of thousands of dollars in property and US Currency, a considerable amount of stolen property, more than 95 firearms, and kilograms of heroin, fentanyl M30 tablets, and methamphetamine.

11.      Based on my experience, I am aware gang/criminal enterprises and members of drug trafficking organizations (hereinafter "DTO") utilize cellular telephones to exchange information, photographs, and felonious communications, to include the names and locations of informants,

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

witnesses, and victims. I have also learned these individuals discuss the acquisition and distribution of controlled substances and firearms to and from other members, as well as discussions about gang related assaults.

12.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

13.     Based upon my training, experience, and participation in the instant investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information.

a.  Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, their vehicles, or the residences of family members, friends, or associates, in their business locations, or in stash houses. This documentary evidence includes telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

b.  I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement. I have also observed incarcerated members of gang/criminal enterprises utilize non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood institutional gang investigators will monitor the call.

c.  In addition, I am also familiar with the use of text messaging, instant messaging, social media, and other messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.

d.  I have learned individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

### ELECTRONIC MEDIA AND FORENSIC ANALYSIS

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

14.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subjects persons and at the Subject Premises, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

15.     *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

16. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

17. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

a.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

#### THE CONFIDENTIAL HUMAN SOURCES

18.     During the course of this investigation, agents utilized several Confidential Human Sources[1] ("CHS" for singular and plural reference) to infiltrate and report on the activities of GONZALEZ. Three (3) CHS were utilized to collect information in the instant investigation. In the paragraphs that follow, I have provided an overview of each CHS, to include their basis of knowledge concerning the criminal conduct; motivation to assist the FBI; criminal history; any compensation received from the government; and a statement concerning their reliability.

19.     I have tried to provide sufficient information to the Court, while balancing the anonymity and safety of the various sources.

20.     **CHS-1** is an experienced drug dealer who has been involved in the Albuquerque drug trade and gang members for some time. CHS-1 is intimately familiar with GONZALEZ and his illegal activites. The CHS is motivated to assist the FBI because a person with whom the CHS maintains a close personal relationship is facing federal charges. The CHS would like to help that person receive a reduced sentence under §5K1.1 of the United States Sentencing Guidelines. The CHS is also motivated to assist the FBI in reducing violent crime in Albuquerque. The CHS is not currently facing criminal charges and has two prior felony convictions for trafficking of control substance and one felony conviction for possession of control substance. The CHS has not received any financial assistance from the FBI. Information provided by the CHS has proven to be reliable in the past and I have not been given reason to doubt the integrity of the information provided by the CHS.

---
[1]   The FBI utilizes the term CHS to describe an informant; however, other agencies may use Confidential Source (CS), Confidential Informant (CI), Confidential Witness (CW), Cooperating Defendant (CD), or Source of Information (SOI). I believe the various terms are interchangeable, but for the purpose of this affidavit I have only used the term CHS.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

21.    <u>**CHS-2**</u> is an experienced gang associate and knowledgeable prior drug trafficker. CHS-2 has been involved in the Albuquerque gang and drug world for several years and has knowledge about influential gangs members. CHS-2 does have a pending charge is motivated to assist the FBI in hopes to receive a positive recommendation in a pending criminal matter. CHS-2 has no felony convictions. CHS-2 has received approximately $200 in financial assistance from the FBI. CHS-2 provided assistance in the instant investigation, and several other investigations. I believe the information provided by CHS-2 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS-2 has provided.

22.    <u>**CHS-3**</u> is a gang member, drug trafficker and has been associated with GONZALEZ and his drug trafficking activities in the past. CHS-3 does have a pending criminal case and was motivated to assist agents in hopes to receive a positive recommendation in that pending criminal matter. CHS-3 has felony convictions for kidnapping, conspiracy, armed robbery, aggravated assault, robbery. CHS-3 has not been paid by the FBI for their cooperation. I believe the information provided by CHS-3 to be reliable because much of it has been corroborated by independent investigation. I am unaware of any false or misleading information that CHS-3 has provided.

<u>**T**HE **T**ARGET **S**UBJECT</u>

23.    <u>JOSE GONZALEZ, aka: "COCHINO":</u> GONZALEZ is a suspected gang member who has 23 prior arrests in New Mexico possession of a controlled substance with intent to distribute, burglary (automobile), tampering with evidence 3x, larceny, possession of a controlled substance (felony) 3x, encouraging violation of probation, parole or bail, aggravated assault with a deadly weapon, criminal damage to property – conspiracy, probation violation, trafficking controlled substances 4x, aggravated burglary with a deadly, abuse of a child, possession of a firearm by a felon 2x, receiving stolen property (retain)(firearm), aggravated battery upon a health care worker (deadly weapon), battery upon a peace

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

officer 2x, receiving/transferring stolen motor vehicles, conspiracy, receiving stolen property (receive)(firearm), theft of a credit card, assault upon a peace officer, distribution of marijuana, use or possession of drug paraphernalia, criminal trespass, resisting an officer, breaking and entering.

24.     Upon reviewing New Mexico certified district court documents, I believe GONZALEZ was convicted of the following felony offenses: battery upon a peace officer, criminal damage to property (over $1,000), theft of a credit card, receiving or transferring a stolen motor vehicle, and breaking and entering, on August 30, 2021, and February 22, 2019, in the Bernalillo County District Court, Case Numbers: D-202-CR#: 2021-01163; 2018-03994; 2018-03676; 2018-03644; 2018-03108;

### THE CURRENT INVESTIGATION

25.     Within the last 72 hours (1/26), CHS-1 advised agents that they had observed GONZALEZ at the Subject Premises. GONZALEZ represented, to CHS-1, that he was staying at the Subject Premises. Also, within the last 72 hours, CHS-1 observed GONZALEZ with firearms, meth[2] and blues[3] at the Subject Premises. CHS-1 further advised agents that they knew GONZALEZ always carried a gun, and they had observed him sell meth and blues. CHS-1 also knew that GONZALEZ was a TCK gang member who picked up meth and blues from his supplier on a weekly basis.

26.     Agents subsequently conducted surveillance at the Subject Premises and observed a male subject, who appeared to resemble GONZALEZ, arrive at the Subject Premises in a blue Mitsubishi Lancer, exit, and enter the Subject Premises. Agents also observed a red Hyundai with apparent bullet holes in the front windshield and a white GMC with license plate AYAW04, registered to a Sarah Lucero. Upon reviewing Lucero's criminal history, I learned that Lucero was arrested in 2014 for a drug trafficking and conspiracy charge.

27.     Within the last week CHS-2 advised agents that GONZALEZ was a TCK Gang member

---

[2] Meth is street slang for methamphetamine.
[3] Blues is street slang for fentanyl M30 tablets.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

who trafficked blues. CHS-2 grew up in the neighborhood and was familiar with multiple TCK[4] Gang members, including GONZALEZ. CHS-2 knew that GONZALEZ was known to always carry a firearm and would not hesitate to use violence to protect his illegal interests. CHS-2 knew that GONZALEZ lived in the south valley area of Albuquerque, however they did not know the exact location of his residence.

28.     CHS-2 believed that GONZALEZ had taken over the drug business for Jerry Bezie, aka "Gizmo," after he was arrested by the FBI.

29.     In December 2023, GONZALEZ posted a video to his social media of his Cadillac Escalade. I have included several screenshots from GONZALEZ's social media below, one of them being a photo of GONZALEZ's Cadillac Escalade.

30.     In July 2023, CHS-3 advised agents that GONZALEZ was a fentanyl distributor. A few weeks prior, CHS-3 had observed GONZALEZ with two gallon size bags full of blues at his house. CHS-3 even described exactly where and how GONZALEZ hid the blues in his house. GONZALEZ supplied CHS-3 with fentanyl, specifically CHS-3 advised that they would buy 100 packs (street slang for 100 fentanyl M30 tablets) almost three times a week from GONZALEZ. CHS-3 advised that GONZALEZ began selling more and making more money after his homie GIZMO (Jerry Bezie) got hit.

31.     CHS-3 also advised that GONZALEZ supplied other gang members with blues. GONZALEZ was spending a lot of money on jewelry, clothes, and usually had a stack of cash. GONZALEZ was very flashy with his Jewelry and expensive items. Some screen shots from GONZALEZ's social media are contained below.

---

[4] Thugs Causing Kaos or True City Kings ("TCK") is a violent street gang located in the southwest area of Albuquerque. TCK has a reputation for violence and is heavily involved in drug trafficking.

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**



Left to right: GONZALEZ throwing "TCK" Gang hand sign; GONZALEZ taking a selfie inside BEZIE's house before the FBI raid in March 2023; GONZALEZ's escalade.



GONZALEZ (left) and Bezie throwing "TCK" Gang handsigns. The pendant/necklace that GONZALEZ is wearing was seized during the March 2023 FBI raid at BEZIE's house and estimated to be worth around

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

$20,000.

32.     In March 2023, the Albuquerque FBI SWAT team assisted the VGTF in executing a search warrant at the residence of TCK Gang member Jerry Bezie, aka: "Gizmo." Agents seized approximately 5 firearms, 25 pounds of fentanyl M30 tablets, 16 pounds of methamphetamine, $60,000 in US Currency, vehicles, all-terrain vehicles, trailers, and the residence/property itself. One piece of jewelry that was seized is observed in the above photograph being worn by GONZALEZ.

### THE SUBJECT PREMISES

33.     The Subject Premises is located at 10115 Range Rd SW, Albuquerque, NM 87121 and may be described as a single story residence with tan stucco siding, brown shingle roof, and white trim. The subject premises is located at the corner of Lone Draw Court SW and Range Road SW, the front door faces west, toward Lone Draw Court SW. The numbers 10115 are posted on the wall to the left of the door. Color photographs are contained in Attachment A.

34.     Indicia of residence

a.     Within the last 24 hours, and several times within the last week, VGTF surveillance has observed a blue Mitsubishi Lancer, with NM tag BCJR32 registered to GONZALEZ, parked in the driveway of the Subject Premises

b.     Within the last 72 hours, VGTF surveillance observed a male individual, who matched the physical description of GONZALEZ, exit the blue Mitsubishi Lancer and enter the Subject Premises.

c.     CHS-1 advised VGTF agents that GONZALEZ lived at the Subject Premises.

d.     Within the last 24 hours, VGTF surveillance observed a vehicle parked at the Subject Premises with apparent bullet holes in the windshield.

e.     Within the last 24 hours, VGTF surveillance observed a white GMC Denali, with license

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

plate AYAW04 and registered to a Sarah Lucero. Upon reviewing Lucero's criminal history, I learned that Lucero was arrested in 2014 for a drug trafficking and conspiracy charge.

<u>CONCLUSION</u>

35.    Based on the information contained herein, I submit there is probable cause for a search warrant authorizing the examination of the Subject Premises described in Attachment A to seek the items described in Attachment B for evidence pertaining to violations of the Target Offenses. This affidavit was reviewed by Assistant United States Attorney Paul Mysliwiec.

Respectfully submitted,

Jordan Spaeth
FBI Special Agent

Subscribed electronically and sworn telephonically on January 29, 2024.

HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

**ATTACHMENT A**
**Premises to be Searched**

The Subject Premises is located at 10115 Range Rd SW, Albuquerque, NM 87121 and may be described as a single story residence with tan stucco siding, brown shingle roof, and white trim. The subject premises is located at the corner of Lone Draw Court SW and Range Road SW, the front door faces west, toward Lone Draw Court SW. The numbers 10115 are posted on the wall to the left of the door.

Color photographs of the Subject Premises are attached below.


VGTF surveillance photo

Note: The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

Biometric Access to Devices: During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel JOSE GONZALEZ to provide biometric

**ATTACHMENT A**
**Premises to be Searched**

features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises.

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT B**
**Items to be Seized**

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of: 21 U.S.C. §§ 841(a)(1) and 846 distribution and possession with intent to distribute controlled substances and conspiracy thereto, 18 U.S.C. § 922(g)(1) possession of a firearm and ammunition by a convicted felon, and 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime to include the following:

1. Firearms, firearm parts, magazines, and ammunition;

2. All safes or lock boxes, where evidence of the Target Offenses may be stored for safekeeping against seizure;

3. Controlled substances, drug packaging materials, and paraphernalia;

4. Documents, notes, or writings detailing other individuals involved in the distribution of controlled substances;

5. Large amounts of United States Currency and expensive jewelry;

6. Cellular telephones believed to contain evidence of the Target Offenses;

7. Video surveillance hard drives or storage devices;

8. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys. All documentation, (whether on paper or stored magnetic, digital, or optical media) describing discussions by any individual or entity concerning: the identity of persons that are involved in violations of the Target Offenses;

9. All documents and communications (whether on paper or stored magnetic, digital, or optical media) demonstrating any communication or correspondence with any person or groups of persons involved in violations of the Target Offenses;

10. All evidence related to all off-site storage units, other residences, safety deposit boxes, etc. where evidence of the Target Offenses may be stored for safekeeping against seizure; and

11. All cellular telephone records to establish ownership of the device or the residence.